1

2

**NOT FOR CITATION**

3

**UNITED STATES DISTRICT COURT**

4

**NORTHERN DISTRICT OF CALIFORNIA**

5

6

7    DONALD E. TURPIN,

8             Plaintiffs,                              No. C 04-01871 PJH

9        v.

10                                                    **MEMORANDUM DECISION AND ORDER THEREON[1]**

11   JO ANNE B. BARNHART, Commissioner
     of Social Security Administration,

12            Defendant.
     _____/

13

Donald E. Turpin ("Turpin") seeks judicial review of the Commissioner's final decision

14

denying his disability benefits pursuant to 42 U.S.C. § 405(g).  The action is before this court

15

on cross-motions for summary judgment, and Turpin's alternative motion for remand.  Having

16

read the parties' papers and administrative record and having carefully considered their

17

arguments and the relevant legal authority, the court remands this case to the Commissioner

18

for further proceedings in accordance with this order.

19

**BACKGROUND**

20

Turpin applied for Social Security disability insurance benefits on March 1, 2002,

21

alleging disability beginning September 1, 2001.  His application was denied both initially and

22

on reconsideration.  Turpin then filed a request for a hearing, which was held before an

23

administrative law judge ("ALJ") on April 16, 2003.  The ALJ rendered an unfavorable

24

decision denying Turpin's application.  Subsequently, Turpin requested review by the Appeals

25

Council.  On March 13, 2004, the Appeals Council denied Turpin's request for review.  Turpin

26

filed the instant appeal with this court on May 12, 2004.

27

28

_____

[1] Pursuant to Civil Local Rule 7-13, this order may not be cited except as provided by Civil Local Rule 3-4(e).

United States District Court

For the Northern District of California

1    At the time of the hearing, Turpin was 38 years old.  He has an 11th grade education

2  and his past relevant work consists of employment as a warehouseman and carpenter.

3  Administration Record ("A.R.") 64, 74.  However, Turpin has not worked since 1998 because

4  of his alleged back pain.  A.R. 203.

5    Turpin alleges disability due to back, right hip, and right leg pain.  On December 7,

6  2001, Turpin sought medical attention from the Emergency Department of the Alameda

7  County Medical Center ("ACMC") for lower back pain.  A.R. 133.  The attending physician

8  noted tenderness in Turpin's left paraspinal muscles and decreased flexion[2] of the back.  A.R.

9  133.  The physician's diagnosis was lumbar strain with sciatic[3] component.  A.R. 133.

10  Approximately one month later, on January 3, 2002, the attending physician diagnosed Turpin

11  with chronic back and right hip pain.  A.R. 104.  However, on the same day, Turpin's straight

12  leg raising tests were negative, and Turpin demonstrated no motor or sensory deficiencies.

13  A.R. 104.

14    On January 11, 2002, magnetic resonance imaging ("MRI") testing was conducted on

15  Turpin's spine and right hip.  A.R. 88.  According to Dr. Morgan's interpretation of the imaging,

16  Turpin suffered moderate generalized degenerative changes to his lumbar spine.  AR. 88.

17  These changes were evident by the osteophyte[4] formation throughout his lower spine.  A.R.

18  88.  No other abnormality to the lumbar spine was identified at this time.  A.R.  88.  Dr. Morgan

19  also determined that Turpin's right hip appeared normal with no fracture, dislocation, or other

20  osseous[5] abnormality of the right hip.  A.R. 88.

21    Subsequently, on January 29, 2002, and February 13, 2002, Turpin sought medical

22

23    [2] "Flexion" means "the act of flexing or bending...."  Stedman's Medical Dictionary (27th

24  ed.) 686 ("Stedman's").

25    [3] "Sciatic" means "relating to or situated in the neighborhood of the ischium or hip."
Stedman's 1602.  "Ischium" is the "lower and posterior part of the hip bone..."  Stedman's 924.

26

27    [4] "Osteophyte" means "bony outgrowth or protuberance."  Stedman's 1285.

28    [5] "Osseus" means "bony, of bone-like consistency or structure."  Stedman's 1280.

2

United States District Court

For the Northern District of California

1  attention for pain radiating from his lower back to his right knee.  A.R. 99, 101.  The attending

2  physician diagnosed Turpin with degenerative joint disease and lower back pain with

3  radiculopathy[6].  A.R. 99, 101.

4      Another MRI on March 26, 2002 revealed a protrusion or herniation at L3-4 of Turpin's

5  lower spine.  A.R. 130.  Similarly, an MRI on April 9, 2002 also showed a disc bulge at L3-4,

6  and Turpin was again diagnosed with disorder of the spinal root nerves.  A.R. 94.

7      On May 9, 2002, Turpin's treating physician, Dr. White, completed a medical source

8  statement regarding Turpin's medical condition.  A.R. 90.  He indicated that Turpin could

9  occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10

10  pounds, stand and/or walk at least 2 hours in an 8-hour workday, and sit for less than 6 hours

11  during an 8-hour work day.  A.R. 90.  Dr. White further noted that Turpin needed a 15 minute

12  break every 30-45 minutes.  A.R. 91.

13      On May 24, 2002, a non-examining physician for the Disability Determination Services

14  ("DDS") assessed that Turpin could lift 20 pounds occasionally and 10 pounds frequently;

15  stand and/or walk about 6 hours in an 8-hour work day; and should perform no frequent pedal

16  work with the right side of his body.  A.R. 141.  The DDS further determined that Turpin could

17  not climb ladders, rope, or scaffolds; but could occasionally climb ramps and stairs, stoop,

18  kneel, crouch, crawl, and frequently balance.  A.R. 142.

19      A few days later, on May 29, 2002, an attending physician noted right hip/thigh

20  numbness and occasional shooting pain to Turpin's right foot due to a L3-L4 herniated

21  nucleus pulposus[7].  A.R. 129.  Turpin was thereafter hospitalized at ACMC from June 27,

22

23

24

25

26      [6] "Radiculopathy" is a "disorder of the spinal nerve roots."  Stedman's 1503.

27      [7] "Nucleus pulposus" is "the soft fibrocartilage central portion of the intervertebral disk..."
28  Stedman's 1240.

3

United States District Court

For the Northern District of California

1   2002, to June 30, 2002 for a hemilaminectomy[8] and discectomy[9] at L3-L4.  A.R. 119.  Post-

2   surgery progress notes dated June 28, 2002, indicate that Turpin did well, with some pain,

3   and moved all of his extremities well with no paresthesia[10] or weakness.  A.R. 114.

4   Approximately two weeks later, on July 12, 2002, Turpin could walk without a walker.  A.R.

5   113.  However, Turpin complained of the same pain in his right leg, new pain in his left leg,

6   and shooting pain in his back.  A.R. 113.

7        On July 29, 2002, Turpin again sought medical attention for pain in his left leg,

8   dizziness, and light headache.  A.R. 187.  The attending physician noted that Turpin's

9   symptoms were not improving post-surgery, and subsequently diagnosed Turpin with fatigue

10  and lower back pain.  A.R. 187.

11       On September 9, 2002, a non-examining DDS physician found Turpin not disabled,

12  and assessed that he could lift/carry 10 pounds, stand and/or walk for at least 2 hours in an 8-

13  hour workday, sit about 6 hours in an 8-hour workday with periodically alternating sitting and

14  standing to relieve pain or discomfort.  A.R. 156.  As such, the DDS physician found Turpin

15  limited to sedentary work based on documented medical evidence.  A.R. 156.

16       On October 16, 2002, Turpin visited ACMC again with complaints of lower back pain.

17  A.R. 174.  The attending physician noted, on October 1, 2002, that Turpin's x-rays

18  demonstrated lumbar spine with hypertrophic[11] spurring at multiple areas with generalized

19  slight narrowing of intervert spaces.  A.R. 174.  The physician diagnosed Turpin as having

20

21

22

---

23  [8] "Hemilaminectomy" is "removal of a portion of a vertebral lamina, usually performed for
24  exploration of, access to, or decompression of the intraspinal contents."  Stedman's 799.

25  [9] "Discectomy" is an "excision, in part or whole, or an intervertebral disk."  Stedman's 508.

26  [10] "Paresthesia" is "an abnormal sensation, such as of burning, pricking, tickling, or
    tingling."  Stedman's 1316.

27  [11] "Hypertrophic" refers to "general increase in bulk of a part or organ, not due to tumor
28  formation."  Stedman's 857.

4

status post-discectomy with muscle spasms and facet syndrome[12].  A.R. 174.

On November 27, 2002, Turpin sought medical attention at ACMC for continuing lower back pain as well as for shooting pain in his leg.  A.R. 172.  The attending physician noted that Turpin was able to ambulate on his own and that he seemed to be doing well with sensation being intact bilaterally.  A.R. 172.  At that time, the doctor rewrote Turpin's prescription for physical therapy to include lower back and leg-strengthening exercise, and evaluation for a TENS[13] unit for electrical stimulation.  A.R. 172.  Progress notes from the same day by a different doctor also indicated that Turpin complained of stiffness and tearing pain in his lower back.  A.R. 173.

Throughout his alleged disability, Turpin used Neurontin, Vicodin, Robaxin, Bextra, and Flexeril.  A.R. 85,209.  He also used a TENS unit, as mentioned above.  A.R. 209.

At the April 16, 2003 hearing before the ALJ, Turpin testified that he is constantly in total discomfort.  A.R. 207.  Within the thirty minute duration of the hearing, Turpin stood up twice because of his pain.  A.R. 217.  Upon questioning by the ALJ, Turpin testified that he worked as a construction worker, but quit in 1998 because he could no longer bend over for lengthy periods of time.  A.R. 203.  Turpin also testified that he worked on the side for friends after he quit his construction job, but it is unclear what kind of work he did.  A.R. 199.

With regard to the treatment he sought because of his pain, Turpin testified that he saw a chiropractor for two years prior to 1998, but stopped because the treatments were unhelpful.  A.R. 204.  Turpin also testified that he received physical therapy for three months[14], but discontinued the therapy when his friend could no longer provide rides.  A.R. 219.  When the

---

[12] "Facet syndrome" is a "form of joint disease involving the articular facets (joint surfaces) of the vertebrae, usually in the lumbar region, ie., in the lower back," Schmidt's Attorney's Dictionary of Medicine, (1996), F-2.

[13] A TENS unit is a pain control device that is portable, pocket-sized, and battery-operated, which lessens acute pain post-surgery.

[14] Based on the record, it is unclear when, during his alleged disability, Turpin sought therapy.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

ALJ asked why Turpin did not find therapy closer to his home, Turpin replied that the services were unaffordable.  A.R. 219.  Turpin also testified that his regular activities included watching and listening to ball games, pacing around the house, and going to the movies with his son (although he must get up two to three times during the viewing because of the pain.)  A.R. 211, 218.  Turpin further testified that he lives with his father and drives "now and again" whenever his father needs something from the store.  A.R. 212.  In addition to lower back and leg pain, Turpin testified that he has difficulty using his arms and hands if he undertakes an "overhead" activity for too long.  A.R. 215.

After the ALJ completed his questioning, Mr. Sackett, Turpin's attorney, also examined Turpin.  Turpin testified that he had actually gone to the movies only two or three times since his first visit to the emergency room in December 2001.  A.R. 221.  Turpin also testified that he suffered from approximately the same level of pain for three months prior to visiting the emergency room in December 2001.  A.R. 223.  When asked if there were any triggering events that worsened his back pain, Turpin testified that his "back went" when he put a drawer in a desk approximately three months prior to his emergency room visit on December 2001. A.R. 223.

At the request of the ALJ, vocational expert Gerald D. Belchick also testified at the hearing.  A.R. 194.  Prior to the hearing, Dr. Belchick reviewed Turpin's vocational records, but none of Turpin's medical records.  In his first hypothetical to Dr. Belchick, the ALJ asked whether Turpin could work as a carpenter or warehouse worker if Turpin could choose to alternately sit and stand throughout the workday.  A.R. 228.  Dr. Belchick replied, "No, sir.  Not at all."  A.R. 228.  In his second hypothetical, the ALJ asked whether a person who: (1) is limited to sitting and standing, (2) could stoop only less than occasionally, and (3) who could lift only light weights, has any transferable skills to other occupations.  A.R. 229.  Dr. Belchick replied that there are no transferable skills to other occupations.  A.R. 229.  When further questioned whether there were any suitable occupations for such an individual, Dr. Belchick replied that the hypothetical individual could perform the job of a cashier.  A.R. 232.

6

**United States District Court**
For the Northern District of California

## STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act ("Act") provides for the payment of disability insurance benefits to people who have contributed to the Social Security system and who suffer from a physical or mental disability. See 42 U.S.C. § 423 (a)(1). "Disability" under the Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). A "physical or mental impairment" is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). To evaluate whether a claimant is disabled within the meaning of the Act, the ALJ is required to use a five-step analysis. 20 C.F.R. § 404.1520. The ALJ may terminate the analysis at any stage where a decision can be made that the claimant is or is not disabled. See Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At step one, the ALJ determines if the claimant is engaged in any "substantial gainful activity," which would automatically preclude the claimant from receiving disability benefits. See 20 C.F.R. § 404.1520(b). If not, at step two, the ALJ must consider whether the claimant suffers from a severe impairment which "significantly limits [the claimant's] physical or mental ability to do basic work activities." See 20 C.F.R. § 404.1520(c). Step three requires the ALJ to compare the claimant's impairment to a Listing of Impairments in the regulations. If the claimant's impairment or combination of impairments meets or equals the severity of any medical condition contained in the Listing, the claimant is presumed disabled and is awarded benefits. See 20 C.F.R. § 404.1520(d).

If the claimant's condition does not match the Listing, the ALJ must proceed to step

four to consider whether the claimant has sufficient "residual functional capacity" ("RFC")[15] to perform his past work despite the limitations caused by the impairment(s).  See 20 C.F.R. § 404.1520(e).  If the claimant cannot perform his past work, at step five, the Commissioner is required to show that the claimant can perform some other work that exists in significant numbers in the national economy, taking into consideration the claimant's "residual functional capacity, age, education, and past work experience."  See 20 C.F.R. § 404.1520(f).

Overall, in steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in his previous occupation.  Andrews v. Shahala, 53 F.3d 1035, 1040 (9th Cir. 1995).  If the analysis proceeds to step five, the burden shifts to the Commissioner to demonstrate the claimant can perform other work.  Id.

### ALJ'S FINDINGS

The ALJ's basis for denying Turpin benefits in this case is not readily apparent because he did not follow the five-step analysis in that order.  Although the ALJ stated that he made the determination that Turpin was not disabled at step five of the analysis, he also appears to have determined that Turpin did not satisfy the one-year durational requirement of the Act, a determination that normally occurs at a much earlier step and terminates the review.

The ALJ first concluded at step one that Turpin had not engaged in substantial gainful activity since September 1, 1998.  A.R. 14.  Subsequently, at step two, the ALJ found that Turpin suffered from a severe impairment, namely "status post L3-L4 hemilaminectomy on the right and L3-L4 diskectomy[sic] for L3-L4 disk herniation."  A.R. 13.  At step three, the ALJ ruled that Turpin's impairments did not meet or equal any in the Listings.  A.R. 14.

It is the ALJ's analysis at steps four and five that becomes less comprehensible.  In evaluating Turpin's RFC and suitable employment for him, the ALJ, for the first time in his analysis, concludes that the onset date of Turpin's severe impairments as set forth above was

---

[15] Residual functional capacity is "the most an individual can still do after considering the effects of physical and/ or mental limitations that affect the ability to perform work-related tasks." 20 C.F.R. § 404.1545(a)(1).

United States District Court

For the Northern District of California

1   not until December 19, 2001, the first date for which medical records regarding Turpin's

2   impairments existed.  In so holding, the ALJ rejected Turpin's testimony that he had suffered

3   from disabling pain associated with the impairments prior to seeking treatment in December

4   2001.  The ALJ found that Turpin "ha[d] not met his burden of proving a severe impairment

5   prior to the medical records of December 2001."  A.R. 14.  In his conclusion, the ALJ

6   specified that "at the earliest," Turpin's documented onset date was December 19, 2001.

7   A.R. 17.

8         Utilizing the onset date of December 19, 2001, the ALJ found that there was "a

9   question as to whether [Turpin's] back impairment met the [one-year] duration requirement [of

10  the SSA]."  The onset date was significant to the ALJ's analysis regarding the duration

11  requirement because the ALJ also rejected Turpin's testimony that the disabling pain

12  associated with his back impairments continued after November 29, 2002 (a few weeks short

13  of one year from the onset date determined by the ALJ), the date that Turpin was released for

14  follow-up treatment.  In rejecting Turpin's testimony, the ALJ found Turpin not credible because

15  of a lack of objective medical evidence, lack of treatment consistent with the alleged pain, and

16  failure to report his earnings to the government.[16]  A.R. 16.  Post- November 29, 2002, the

17  ALJ found that "there was clearly medical improvement in [Turpin's] back condition," A.R. 12,

18  and that "[w]ithin 12 months of onset documented, as of December 19, 2001, [Turpin had]

19  sufficient restoration of function so that in spite of significant remaining limitation, [Turpin] was

20  able to engage in other substantial gainful activity, considering pertinent vocational factors."

21  A.R. 17.

22        In support, the ALJ held that Turpin's "unsubstantiated testimony" regarding continued

23  disabling pain was "without basis in the objective medical evidence."  According to the ALJ,

24        [Turpin's] unsupported allegations of pain are arbitrary and there is no proof
            whatsoever of any attempt to deal with that pain.  There is no record of any

25

26  _____

27        [16]This is apparently related to Turpin's testimony at the hearing that after quitting his job
    as a carpenter in 1998 due to back pain, he had worked at various odd positions for a couple
28  years later that did not cause him as much pain.

United States District Court

For the Northern District of California

therapy, no physician's treatment specializing in pain, and no evidence of any alternative means used for recovery.

The ALJ further stated that "the medical evidence provides no support for any continuing inability to work now."

Given these findings, it therefore appears that the ALJ first found that Turpin did not satisfy the one-year durational requirement of the Act, but nevertheless proceeded to steps four and five of the analysis anyway.

At steps four and five, the ALJ then appears to have bifurcated his analysis according to different time periods. First, he concluded that during the period when Turpin's condition was "most severe," from December 19, 2001 through November 29, 2002, Turpin still retained the RFC for "sedentary" work even though he was not able to perform his past relevant work as a carpenter and/or warehouseman. In evaluating Turpin's RFC, the ALJ credited the assessment of the DDS physician. A.R. 16, 17. The ALJ ultimately concluded that Turpin was physically able to lift or carry 10 pounds frequently, stand and/or walk for at least 2 hours in an 8-hour work day, and sit about 6 hours in an 8-hour work day. A.R. 16. The ALJ, however, did not specify which positions of sedentary work Turpin would have been able to perform during this "most severe" period.

The ALJ also was not clear regarding Turpin's post- November 2002 RFC . While stating that such RFC was "far less restricted than that at his most severe," it appears that the ALJ continued to assume that Turpin's RFC would have been consistent with sedentary work, and that he would be able to perform such work.

**DISCUSSION**

**A.    STANDARD OF REVIEW**

An ALJ's decision can be set aside only if "the ALJ's findings are based on legal error or are not supported by substantial evidence." Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th

10

United States District Court

For the Northern District of California

1   Cir. 1989).  The court is required to review the administrative record as a whole, weighing

2   both the evidence that supports and detracts from the ALJ's conclusion.  Id.  Where the

3   evidence is susceptible to more than one rational interpretation, the court must uphold the

4   ALJ's decision.  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

5   **B.    ANALYSIS**

6       **I.    The ALJ Should Have Consulted A Medical Expert to Determine Turpin's**
7   **Onset Date of Disability**

8       Turpin contends that the ALJ erred in establishing the December 19, 2001 onset date.

9   This court agrees.  Because ambiguities existed regarding Turpin's onset date, the ALJ was

10  required to consult a medical expert, and his failure to do so was reversible error.  See

11  Armstrong v. Commissioner, 160 F.3d 587, 589 (9th Cir. 1998) (ALJ's failure to call medical

12  expert before inferring an onset date where the record was unclear was reversible error).

13      In order to obtain disability benefits, Turpin was required to demonstrate that he was

14  disabled for twelve continuous months prior to his date last insured ("DLI"), December 31,

15  2003, a date that is not disputed.  See 42 U.S.C. § 423(c); see also Armstrong, 160 F.3d at

16  589; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).  Turpin claimed at the hearing

17  before the ALJ that his onset date was no later than September 2001.  In his papers before

18  this court, Turpin further correctly notes that, utilizing the ALJ's November 29, 2002 end date to

19  his severe impairment, in order to satisfy the durational requirement, Turpin was required to

20  demonstrate an onset date no later than November 29, 2001, a couple weeks shy of the onset

21  date found by the ALJ.

22      Although Turpin bears the burden of proof regarding his onset date, the ALJ must

23  assist in developing the record.  See Armstrong, 160 F.3d at 589; DeLorme v. Sullivan, 924

24  F.2d 841, 849 (9th Cir. 1991).  It is well-established, though, that the significant date for

25  disability determination is the date of onset of the disability, not the date of diagnosis or the

26  DLI.  See Morgan v. Sullivan, 945 F.2d 1079, 1081 (9th Cir. 1991); see also Social Security

27

28

11

Ruling 83-20 ("SSR 83-20").[17] This is especially true for impairments that are progressive in nature and whose onset dates may be elusive.  See id.

The ALJ in this case erred when he did not call a medical advisor, but instead inferred, based on the dates of medical treatment, that the onset date of Turpin's disabling impairments was not prior to the date he first sought treatment at the emergency room.  The ALJ mistakenly confused the concept of onset date with dates of diagnoses and treatment.

The Ninth Circuit has frequently endorsed SSR 83-20, which provides in pertinent part:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the diseases process.
>
> . . . .
>
> In some cases it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in a particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge should call on the services of a medical advisor when onset must be inferred.

See Armstrong, 160 F.3d at 589-90 (discussing ruling); see also Morgan, 945 F.2d at 1082; DeLorme, 924 F.2d at 848.  The Ninth Circuit has held, based on SSR 83-20, that where medical inferences regarding the onset date need to be made, the ALJ *must* consult a medical expert before determining the onset date, regardless of how careful and well-supported the ALJ's inference may be.  See Armstrong, 160 F.3d at 590; see also Anderson v. Apfel, 2000 WL 913666 at *6 (D. Or. 2000).

A review of the record and evidence before the ALJ demonstrates an ambiguity regarding the onset of Turpin's impairments.  In fact, the ALJ himself acknowledged the

---

[17]Social Security Rulings "are binding on all components of the administration."  Sullivan v. Zebley, 493 U.S. 521, 531 n.9 (1990).

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ambiguity or "question" as to onset date.  First, Turpin's medical records themselves, upon

which the ALJ relied, indicated that his onset date was sometime in November 2001.  *See*

A.R. 97, 133.  Moreover, Turpin testified that his "back went" several months prior to his

December 2001 visit to the emergency room, and that it was only upon "finally being talked

into" going to the hospital that he went.  A.R. 204, 222.  Turpin further attested that he had

been experiencing back problems as early as 1998 when he quit his job as a carpenter.  A.R.

203-04.

The absence of medical records prior to December 2001 does not diminish the

ambiguity regarding onset date or relieve the ALJ of his duty to develop the record with

respect to this period.  See Speight v. Apfel, 108 F. Supp. 2d 1087, 1090-91 (C.D. Cal. 2000)

(recognizing that the claimant's emotional disorders could have dated back to her alleged

onset date of 1992 even though she was not diagnosed with depression until 1996).

## II.    The ALJ Failed to Give Adequate Reasons for Rejecting Turpin's Testimony Regarding the Severity of His Pain

This court also finds  that the ALJ improperly discredited Turpin's allegations of pain.

While the ALJ is responsible for determining credibility, the ALJ's findings "must be

supported by specific, cogent reasons."  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir.

1998).  "General findings are insufficient, rather, the ALJ must identify what testimony is not

credible and what evidence undermines the claimant's complaints."  Id.

An individual's statement as to pain and other symptoms "shall not alone be conclusive

evidence of disability."  42 U.S.C. § 423(d)(5)(A).  Likewise, the ALJ is not required to believe

every allegation of disabling pain or else "disability benefits would be available for the asking."

Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  Nonetheless, because "pain is a highly

idiosyncratic phenomenon, varying according to the pain threshold and stamina of the

individual victim," Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986), weighing the

credibility of a claimant's pain testimony can be difficult.

Thus, the standard for evaluating pain requires that a claimant produce medical

**United States District Court**
For the Northern District of California

1  evidence of an underlying impairment which is reasonably likely to be the cause of the alleged

2  pain.  Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).  The severity of pain need not be

3  corroborated by objective medical findings, but some impairment must be medically

4  determinable.  Id. at 347.  Once the claimant has shown the existence of an underlying

5  impairment, the ALJ may not reject symptom testimony simply because it is not fully consistent

6  with the objective medical evidence.  Id. at 345.

7       Absent affirmative evidence of malingering, the ALJ can reject the claimant's testimony

8  about the severity of her symptoms only by offering clear and convincing reasons.  Reddick,

9  157 F.3d at 722.  Evidence that can be considered in evaluating a claimant's credibility

10  include inconsistencies in the claimant's testimony, the extent of the claimant's daily activities,

11  observations of physicians, or any unexplained failure to follow a course of prescribed

12  treatment.  Bunnell, 947 F.2d at 346.  Additionally, notwithstanding the Bunnell standard, a lack

13  of objective medical evidence can be a relevant consideration when coupled with the above

14  factors in determining the severity of the claimant's pain.  Rollins v. Massanari, 261 F.3d 853,

15  857 (9th Cir. 2001).

16       In this case, the ALJ did not articulate adequate reasons for rejecting Turpin's

17  subjective pain testimony.  The ALJ reasoned that Turpin's pain testimony is "without basis in

18  the objective medical evidence."  A.R. 16.  However, this court disagrees and finds that the

19  medical records contain objective medical evidence of an underlying impairment which is

20  reasonably likely to be the cause of the alleged pain.

21       As discussed, on January 11, 2002, MRI testing revealed moderated generalized

22  degenerative changes of the lumbar spine; these changes were evident by the bony outgrowth

23  at multiple levels.  A.R. 88.  A few weeks later, Turpin was diagnosed with degenerative joint

24  disease and lower back pain with disorder of the spinal nerve roots.  A.R. 99, 101.  Two

25  additional MRIs on March 26, 2002 and April 9, 2002 showed a disc bulge and Turpin was

26  again diagnosed with disorder of the spinal root nerves.  A.R. 94.  On June 27, 2002, Turpin

27  underwent a hemilaminectomy and discectomy at L3-L4.  A.R. 119.  Post-surgery x-rays on

28

United States District Court

For the Northern District of California

1    October 1, 2002, revealed that Turpin's spine had increased bulk at multiple areas and

2    generalized slight narrowing of intervert spaces.  A.R. 174.  The attending physician

3    diagnosed Turpin as having status post L3-L4 discectomy with muscle spasms and facet

4    syndrome.  A.R. 174.

5           Furthermore, the ALJ discredited Turpin's subjective pain testimony because "there is

6    no proof whatsoever of any attempt to deal with...[the] pain."  A.R. 16.   The ALJ determined

7    that "there is no record of any therapy, no physician's treatment specializing in pain, and no

8    evidence of any alternative means used for recovery."  A.R. 16.  However, contrary to the

9    ALJ's findings, the medical records do indicate Turpin's attempts to deal with his pain.  Turpin

10   sought medical attention on numerous occasions and underwent surgery to alleviate his

11   pain.[18]  At his hearing, Turpin testified to using a TENS unit to stimulate his muscles, albeit not

12   often because the electrodes pulled the hair off of his body.  A.R. 209.  Turpin also received

13   physical therapy for three months but discontinued the therapy because he lacked

14   transportation and because it was too costly.  A.R. 219.   Moreover, throughout his disability,

15   Turpin used Neurontin, Vicodin, Robaxin, Bextra and Flexeril.  A.R. 85, 209.

16          In rejecting Turpin's testimony, the ALJ also pointed out that Turpin "was not credible

17   about reporting his earnings to the government."  A.R.  16.  Although adverse character

18   evidence is an appropriate factor to consider, that factor alone is not adequate to satisfy the

19   requirement that the ALJ offer clear and convincing reasons for rejecting Turpin's credibility,

20   as required by Ninth Circuit law.  See Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995)

21   (citing Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995)).;  Reddick, 157 F.3d at 722.

22   Accordingly, this court remands on this issue so the ALJ can formulate "specific, cogent

23   reasons" for discrediting Turpin's credibility.  Reddick, 157 F.3d at 722.

24          In this case, the ALJ's rejection of Turpin's testimony affected not only the ALJ's

25   determination regarding Turpin's RFC – but also affected his assessment of Turpin's ability to

26

27

28          [18]  A.R. 133, 104, 88, 99, 101, 130, 94, 129, 119, 113, 114, 187, 174, 172, 173.

satisfy the Act's durational requirement.  As noted, Turpin testified that he continued to suffer disabling pain beyond the November 29, 2002 end date adopted by the ALJ.  Crediting Turpin's testimony, the ALJ may have concluded that Turpin satisfied the durational requirement *even if his onset date was indeed December 19, 2001.*  Moreover, assuming Turpin's testimony was credited, the vocational expert attested that there would have been no suitable sedentary positions available to Turpin.  See A.R. 238.

### CONCLUSION

Because the onset date of Turpin's impairments was ambiguous, the ALJ was required to call a medical expert before inferring the date.  Here, the ALJ made the inference regarding onset in favor of the Commissioner without the benefit a medical advisor, and therefore erred at Step Two of the sequential analysis.  Accordingly, this case is reversed and remanded for determination regarding Turpin's entitlement to disability benefits, with the assistance of a medical advisor regarding Turpin's onset date.  Additionally, on remand,  the ALJ must reconsider Turpin's testimony regarding his pain and make specific findings.

For the reasons set forth above, Turpin's motion for summary judgment is GRANTED. The Commissioner's cross-motion for summary judgment is DENIED.  The case is remanded to the Commissioner for further proceedings consistent with this order.

This order fully adjudicates the motions listed at Nos. 14 and 17 of the clerk's docket for this case, closes the case, and terminates all pending motions.

**IT IS SO ORDERED.**

Dated: April ___, 2005.

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court

For the Northern District of California

16